IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 10-730 (JBS) |
| GEORGE J. DILWORTH, | |
| Defendant. | **OPINION** |

APPEARANCES:

PAUL J. FISHMAN,
United States Attorney
     By:  Jason M. Richardson, AUSA
401 Market Street
P.O. Box 1427
Camden, NJ  08101
     Attorney for the United States

Patrick A. Mullin, Esquire
THE LAW OFFICES OF PATRICK A. MULLIN
Suite 1400
One Parker Plaza
400 Kelby Street
Fort Lee, NJ  07024
     Attorney for Defendant

**SIMANDLE**, Chief Judge:

## I.  INTRODUCTION

This matter is before the Court on reconsideration of the Court's December 12, 2011 opinion and order denying the defendant's motion to suppress evidence gathered as a direct or indirect result of the IRS' November 30, 2006 interview of the defendant during a civil audit.  [Docket Item 25.]  The court heard oral argument and conducted a formal suppression hearing

where two witnesses testified on February 22 and 29, 2012. The
principal issue to be decided is whether statements made by the
accused during the course of a civil tax audit conducted by an
IRS revenue agent should be suppressed because they were
allegedly sought by the IRS at a point in time when the IRS
already had "firm indications of fraud" and therefore should have
referred the investigation to the criminal investigation
division. For the reasons discussed herein, on reconsideration
the court concludes that its original decision denying the
defendant's motion to suppress was correct and therefore, the
court will again the deny the defendant's motion to suppress.


**II.  BACKGROUND**

Defendant George Dilworth is presently indicted on three
separate charges. Count I of the Indictment charges the
defendant with conspiracy to evade taxes in violation of 18
U.S.C. § 371. Specifically, Count I alleges defendant, along
with co-conspirators Luciano DiSalvatore, Michael Schaffer and
Anthony Sentore, conspired to conceal taxable income from the IRS
by falsely and fraudulently characterizing as "loans" payments
from Dilworth and DiSalvatore to Sentore and Schaffer for Sentore
and Schaffer's business interest in Municipal Code Inspections,
Inc. (hereinafter "MCI"), which constituted taxable income to
Sentore and Schaffer. [Docket Item 29.]

Counts II and III of the Indictment charge the defendant with making false statements to IRS agents in violation of 18 U.S.C. § 1001.  Count II of the Indictment alleges defendant falsely claimed on November 30, 2006, that the payments to co-conspirators Anthony Sentore and Michael Schaffer were loans from MCI.  Count III of the Indictment alleges defendant falsely claimed that the payments to co-conspirators Anthony Sentore and Michael Schaffer were loans from MCI on March 9, 2007.  [Docket Item 29.]

The defendant moved to suppress evidence gathered as a direct or indirect result of the IRS' November 30, 2006 interview with the defendant, wherein the defendant allegedly made the false statement which is the basis of Count II of the indictment. During the interview, the defendant told Revenue Agent Elmore Phillips that the two six figure transactions between defendant and Di Salvatore to Sentore and Schaffer were in fact loans, not payments for Sentore and Schaffer's business interest in MCI, and therefore not reportable taxable income by Sentore and Schaffer. The defendant argued that IRS Revenue Agent Elmore Phillips had firm indications of fraud prior to the November 30, 2006 interview and did not refer the case to the Criminal Investigation Division (hereinafter "CID") as required by IRS regulations.  Instead, Agent Phillips conducted a civil audit interview on November 30, 2006 and did not inform the defendant

at the time of the interview that there were indications of criminal fraud. Consequently, the defendant argued that this interview exceeded the scope of any consent given by the defendant and constituted an unreasonable search in violation of the Fourth Amendment.

The Court held in its December 12, 2011 opinion that the IRS did not have firm indications of fraud prior to the November 30, 2006 interview and did not violate the Fourth Amendment by continuing to conduct the civil audit at that time. First, the court noted that there was no evidence of deception on the part of the IRS agents during the November 30, 2006 interview. Specifically, Revenue Agent Phillips did not tell the defendant the meeting was strictly civil or affirmatively misrepresent the purpose of the meeting. The Revenue Agent also told Dilworth the purpose of the November 30 meeting was to gather information on how MCI worked as a corporation. The Court reasoned that questions about the defendant's ownership interest in MCI and the two questionable transactions were properly within the scope of this meeting.

In addition, the Court explained that after this meeting, the case was referred to CID for a criminal investigation. Importantly, the court noted that there was no evidence of CID involvement prior to the referral to CID after the November 30, 2006 meeting.

The Court found that the mere failure of the Revenue Agent to give the defendant notice that the November 30, 2006 investigation, which was part of a months-long civil audit, may result in criminal charges does not by itself constitute fraud, deceit and trickery.  See United States v. Tweel, 550 F.2d at 299.  Therefore, the court held that the November 30, 2006 interview was not an unconstitutional search and suppression was not warranted.

The defendant filed a motion for reconsideration of the court's denial of his suppression motion.  In granting reconsideration and concluding that a formal suppression hearing was necessary, the Court found that several important items of evidence submitted in connection with the defendant's original motion were not sufficiently considered by the Court.[1]

Further, the court recognized that this civil audit was given a status level 17 for fraud awareness at its inception in

---

[1] In particular, the Court overlooked an email exchange between Revenue Agent Phillips and the Fraud Technical Advisor, Mark Gerwald, which took place two days prior to the November 30, 2006 meeting.  This email exchange discussed the potential transfer of the defendant's case to CID and scheduled a meeting in December to determine if transfer to CID was warranted.  Since this email exchange occurred prior to the November 30, 2006 interview, there was an issue of fact as to whether firm indications of fraud existed prior to the interview.  The defendant reasoned that if firm indications of fraud existed prior to the November 30, 2006 meeting, the IRS agent's withholding of the criminal nature of the investigation from the Defendant would amount to deceit and the evidence from the Defendant's interview should arguably be suppressed.

June, 2006.  A status of 18 would require a transfer to CID.
After assigning Defendant's case to level 17, the IRS collected
and reviewed numerous documents in connection with the defendant
and the corporation, Municipal Code Inspections.  (Def.'s Ex. C.)
Revenue Agent Larado even visited the corporation's headquarters
and conducted a field investigation.  (Def.'s Ex. C.)  In
addition, Revenue Agent Phillips also reviewed numerous documents
submitted by the defendant and interviewed the defendant's Power
of Attorney.  (Def.'s Ex. J.)  All of this occurred prior to the
November 30, 2006 meeting with the Defendant.  The Revenue Agent
also met regularly with the Fraud Technical Advisor over this
five month period of time.  However, the status of Defendant's
case remained 17 despite all of the additional information
gathered by the IRS agents.

When this five month document review and field investigation
period was viewed in conjunction with the scheduling on November
28, 2006, of the December 11, 2006 meeting to discuss referral to
the CID prior to the defendant's interview on November 30, 2006,
the Court found that there was an issue as to whether firm
indications of fraud were developed prior to the Defendant's
interview and whether the CID referral was purposefully delayed
until after the interview took place.  Further, the IRS Fraud
Technical Advisor Mark Gerwald was significantly involved in the
Defendant's case from June 2006 onward and the role of the Fraud

Technical Advisor as an intermediary position between the Civil Division and the Criminal Division of the IRS was unclear from the record.

The Court determined that a formal hearing was necessary to determine whether firm indications of fraud existed prior to the November 30, 2006 meeting. In particular, the Court concluded that the testimony of Revenue Agent Elmore Phillips and Fraud Technical Advisor Mark Gerwald was necessary in determining the merits of the defendant's suppression motion, even though neither Defendant Dilworth or the Government had suggested the need for such testimony at the initial suppression hearing in 2011.

The Court then conducted the suppression hearing where extensive testimony was taken from Mr. Phillips and Mr. Gerwald over two days. The Court then reserved decision and has fully reviewed the record before it.

## III. DISCUSSION

### A. Findings of Fact

After hearing testimony from Revenue Agent Elmore Phillips and Fraud Technical Advisor Mark Gerwald, and considering the arguments and submissions of counsel, the Court makes the following findings of fact.

In the Internal Revenue Service, Revenue Agents are generally concerned with civil tax issues, while Special Agents

conduct criminal tax investigations.  Revenue Agent Elmore

Phillips (hereinafter "Phillips") has been with the IRS as a

revenue agent for ten years.  The civil audit of L. Jay, Inc. was

Phillips' first audit of an S-corporation and this case is the

first case Phillips handled which involved fraud.  Phillips kept

a detailed activity log of his civil audit of L. Jay, Inc. as

well as his eventual audit of the defendant and MCI.  Phillips

dealt primarily with Victor A. Fabietti, Jr. ("Fabietti") in his

civil audit investigation because Fabietti was the power of

attorney for L. Jay, Inc., MCI and defendant Dilworth.  Fabietti

represented himself to the IRS as a certified public accountant

and was therefore qualified to serve as a power of attorney.

Phillips eventually detected a discrepancy about Fabietti's CPA

credentials and confronted him about it as discussed below.

Phillips spoke extensively with Fabietti regarding the

corporate purpose of L. Jay, Inc. and MCI and was unable to get

satisfactory answers.  Consequently, Phillips attempted to

arrange a meeting with the defendant to discuss the nature and

purpose of MCI and this meeting was repeatedly cancelled and

rescheduled by Fabietti.

Sometime after the audit was commenced against the defendant

in June 2006, Phillips learned that Fabietti, who was the

defendant's representative to the IRS during the audit as his

power of attorney, was not a certified public accountant despite

his contrary representation to the IRS. Phillips confronted Fabietti with the knowledge of Fabietti's lack of CPA status and Fabietti explained to Phillips that certain continuing professional education credits were not applied properly in order to renew his license. Fabietti further told Phillips that he had been in contact with the New Jersey Professional License Board to resolve the discrepancy.

Phillips did not pursue Fabietti's credentials further and did not note his discussion with Fabietti on his activity log for defendant's audit or his activity log of MCI's audit.[2] Phillips did not disclose his discussion with Fabietti or his discovery of Fabietti's lapsed CPA license to the defendant. Phillips also continued to work with Fabietti as the defendant's representative in the civil audit of the defendant and MCI. There was no doubt, however, that Fabietti was the preparer of the tax returns under audit, and that as the preparer, he qualified as a suitable representative of the taxpayer under IRS regulations.[3]

During his investigation, Phillips reached out to Special Agent Gavin because Gavin had experience investigating the South

---

[2] Phillips did note his conversation with Fabietti in the activity log of another audit in a related case. [Docket Items 39 and 40.]

[3] See IRS Publ. No. 947 (indicating that the tax return preparer may be designated by the taxpayer as the representative who may appear before the IRS when questions arise about the return.

Jersey construction industry, which was the industry L. Jay, Inc. and MCI were purportedly involved in. As a Special Agent, Gavin is affiliated with the criminal division of the IRS. Specifically, in June 2006, Phillips emailed Gavin a list of the Form 1120's and the shareholders involved in the audits of L. Jay, Inc., MCI and the defendant. Phillips testified that he was asking Gavin whether he had any information about the defendant and the other taxpayer who was a shareholder in L. Jay, Inc. and MCI. Phillips testified that he reached out to Gavin for information on the construction industry and that he did not know that the Special Enforcement Program, which Gavin as a part of, was principally a criminal investigative unit.

When Gavin received the information, Phillips testified that Gavin called him and informed him he had not been able to research his resources and that Gavin was still interested in the case. Phillips did not receive any information from Gavin and did not contact him again during the course of his civil audits. Thus, Gavin played no role in directing Phillips' investigation or in providing any useful information to Phillips.

Also during the course of his investigation, Phillips worked closely with the Fraud Technical Advisor, Mark Gerwald (hereinafter "Gerwald") on the audit of defendants MCI and L. Jay, Inc. Phillips testified that it was not his decision to determine whether to refer the case to CID. Rather, according to

Phillips, whether to refer the case to CID would be the decision of the Fraud Technical Advisor,[4] in conjunction with Phillips' supervisor. Therefore, Phillips communicated regularly with Gerwald from June 2006 until the ultimate CID referral in January, 2007.

Phillips testified that he thought he might have firm indications of fraud prior to the November 30, 2006 meeting. On the other hand, he admitted he was confused about MCI's structure and believed that Fabietti had not given responsive answers to his questions, and that he needed to get Dilworth's explanation before he could assess whether criminal fraud was involved. At the hearing, Phillips stressed that it was not his determination to refer the case and instead stated that his role was to get as much information as he could and bring this information to the Fraud Technical Advisor and his group manager. Phillips testified that the decision of whether to refer the case to CID was made by Gerwald, the Fraud Technical Advisor and group manager, not by him.

Gerwald testified that he had been a Fraud Technical Advisor for thirteen years and his role is to be available to Revenue

---

[4] The IRS Fraud Technical Advisor provides assistance to Revenue Agents in cases potentially involving fraud. If a Revenue Agent believes their case may have fraud potential, the Revenue Agent is instructed to call the assigned Fraud Technical Advisor for the region and work with the Fraud Technical Advisor in conducting the civil audit and making the decision whether to refer the case to the criminal division for investigation.

Agents who are handling cases that might involve fraud. Gerwald testified that in his experience, out of 100 cases of fraud potential, only 5-10 cases are referred to CID, 10-20 cases are referred to the civil fraud unit and others ultimately involve no fraud at all.

Gerwald explained that the level of evidence determines whether a criminal referral is made. Gerwald distinguished between a first indication of fraud and firm indication of fraud and explained that a firm indication of fraud is formed after third party evidence is gathered and the revenue agent interviews the taxpayer to see if the taxpayer knew the true nature of the questionable transaction or had an exculpatory explanation for it.

Both Phillips and Gerwald emphasized the importance of having at least one interview with the taxpayer prior to CID referral so as to make certain that no credible explanation existed for discrepancies found in a taxpayer's audit. Phillips had conducted a thorough document review and met with Fabietti multiple times throughout the defendant's audit, but had not met with the defendant himself to discuss the discrepancies in his tax returns. Therefore, Gerwald testified that referral to CID was not appropriate until at least after November 30, 2006, when Phillips first had the opportunity to meet with the defendant.

Gerwald testified that the decision to refer a matter to CID

was a collaborative decision between the Revenue Agent, the group manager and himself as the Fraud Technical Advisor.  The decision to refer to CID is typically made after multiple years of tax returns have been reviewed and the taxpayer has been interviewed. Gerwald emphasized that the most important evidence in determining whether there are firm indications of fraud is whether a pattern exists after examining more than one year of tax returns.  After a pattern is revealed, a revenue agent must request a voluntary interview with the taxpayer to determine if a credible explanation exists for the discrepancy.

As to the instant case, Gerwald testified that there was not enough evidence for a referral to CID until after November 30, 2006, when the defendant as the taxpayer had been interviewed, despite the ambiguous language used on the Fraud Technical Awareness sheet five months earlier.  Specifically, the June 14, 2006 "Fraud Awareness Lead Sheet" stated the Defendant's case "was reviewed [sic] Fraud Technical Advisor Mark Gerwald on June 14, 2006 and there are considerable (albeit early) indicators of fraud which translate placing this case into Status 17.  The FTA will continue to work with the RA where additional evidence comes through toward the development of firmer indicators of fraud with respect to IRM 25.1.2."  (Def.'s Ex. C, "Fraud Awareness Lead Sheet and Fraud Development Status Worksheets" at 2)(emphasis added).

Gerwald explained that his use of "firmer indicators of fraud" did not mean that "firm" indications of fraud currently existed. Rather, Gerwald testified that early indicators of fraud existed, and that he instructed Phillips to contact him when firm indicators arose. In particular, as of June 2006, only one year of tax returns had been reviewed by Phillips and the defendant, the taxpayer, had not been interviewed. By November 2006, multiple years of tax returns were reviewed and showed a pattern of fraud but the taxpayer had yet to be interviewed. Therefore, Gerwald concluded that firm indicators of fraud did not exist.

Gerwald further testified that he was not informed that Fabietti had lied to the IRS about his credentials as a CPA; however, Gerwald testified that this additional evidence would not have mattered in determining whether to refer to matter to CID. Gerwald testified that it was the group manager's responsibility to deal with any issues involving the power of attorney, not his.

Gerwald also explained that he did not advise Phillips to contact Special Agent Gavin; however, he was not surprised that Phillips contacted Gavin considering that Gavin was the subject matter expert on the construction industry in South Jersey. Subject matter experts are agents in the IRS that have experience handling industries or fields and they share their knowledge

openly.  As the subject matter expert in the construction industry, revenue agents were encouraged to contact Gavin, regardless of his position as a Special Enforcement Agent, if they had questions regarding the construction industry which were pertinent to their civil audits.  However, Gerwald did admit that when Gavin works on a case, the case is normally criminal, not civil, in nature.  Here, as noted above, Special Agent Gavin played no role in developing this case, let alone in directing the Revenue Agent to develop a criminal case.

By November 28, 2006, with Phillips' interview of Dilworth scheduled for two days later, it was anticipated that there would be sufficient information obtained through Dilworth to be able to assess whether to make a criminal referral, and the referral meeting was therefore scheduled to occur after Dilworth could, for the first time, be interviewed.  This is a reasonable way to proceed, avoiding a decision on referral until Dilworth's explanation, if any, could be obtained and evaluated.

Finally, Gerwald testified that the December 11, 2006 meeting, which was scheduled prior to the defendant's interview, was convened to discuss a potential CID referral.  However, after the meeting, Gerwald sent Phillips out to interview Fabietti one more time.  Therefore, Gerwald testified that as of December 11, 2006, there were still no firm indicators of criminal fraud and Gerwald advised Phillips to continue with the civil

15

investigation.  Accordingly, Gerwald maintained that firm
indicators of fraud did not develop until after the December 11,
2006 meeting.

**B. Analysis**

The suppression of a defendant's statements in a criminal
case is a remedy employed to deter serious misconduct by law
enforcement officers in violation of a suspect's rights.  By its
nature, the judicially-created remedy of suppression of evidence
is employed where the societal balance is struck in favor of
deterring unconstitutional conduct by law enforcement officers or
other substantial violations of rights, at the expense of
precluding evidence that may well be sufficient to convict the
accused of a crime.  United States v. Leon, 468 U.S. 897, 907-08
(1984).  Thus the Supreme Court has repeatedly stated it is
reluctant to expand the contours of the suppression remedy beyond
the point necessary to deter law enforcement violations of
constitutional rights.  See Colorado v. Connelly, 479 U.S. 157,
166 (1986)(recognizing that courts should be cautioned against
expanding currently applicable exclusionary rules  and
emphasizing that the exclusionary rule imposes a substantial cost
on society and should only be used to enforce constitutional
guarantees);  Pennsylvania Bd. of Probation and Parole v. Scott,
524 U.S. 357, 363 (1998)("because the [exclusionary] rule is
prudential rather than constitutionally mandated, we have held it

to be applicable only where its deterrence benefits outweigh its substantial social costs"); <u>Hudson v. Michigan</u>, 547 U.S. 586. 591 (2006)("Suppression of evidence, however, has always been our last resort, not our first impulse.").

For non-custodial questioning by law enforcement, the touchstone inquiry is whether the suspect's statement was voluntarily given. Thus, statements not obtained in violation of a person's <u>Miranda</u> rights or right to counsel are nonetheless also subject to suppression as violative of due process if the statements are coerced or involuntary. <u>Arizona v. Fulminante</u>, 499 U.S. 279, 287-91 (1991).

A statement is deemed coerced or involuntary if the behavior of the "law enforcement officials was such as to overcome the will to resist and bring about a confession not freely self-determined." <u>Rogers v. Richmond</u>, 365 U.S. 534, 544 (1961). Significantly, coercive government activity is a necessary predicate to finding a statement involuntary. <u>Colorado v. Connelly</u>, 479 at 167. A court must look at the totality of the circumstances to determine whether a statement was coerced or involuntary. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973).

The Third Circuit has likewise emphasized that the test for voluntariness is not a but-for test, but instead requires the court to examine the totality of the circumstances. The Third Circuit explained that suppression is warranted only when the

government tactics at issue, when viewed in the context of the

surrounding circumstances, are "so manipulative or coercive that

they deprived [the defendant] of his ability to make an

unconstrained, autonomous decision to confess." Miller v.

Fenton, 796 F.2d 598, 605 (3d Cir. 1986). In particular:

> it is generally recognized that the [government] may use
> some psychological tactics in eliciting a statement from
> a suspect. For example, the interrogator may play on the
> suspect's sympathies or explain that honesty might be the
> best policy for a criminal who hopes for leniency from
> the state. These ploys may play a part in the suspect's
> decision to confess, but so long as that decision is a
> product of the suspect's own balancing of competing
> considerations, the confession is voluntary.

Id. (citations omitted).

Accordingly, it is far from clear that a suppression remedy

extends to a situation, as alleged here, where an IRS revenue

officer, during the course of a civil audit collects evidence of

fraud and continues his investigation, including an interview of

the taxpayer, even if the statement were obtained after the point

where a referral for criminal investigation could have been made.

No Supreme Court or Third Circuit case so holds.[5]  The support

---

[5] To the contrary, the Supreme Court has noted that IRS
agents in interviewing a taxpayer in his home after identifying
themselves is not an inherently coercive environment, Beckwith v.
United States, 425 U.S. 341, 347 (1976). Such circumstances, as
in the present case, do not have a tendency "to overbear [the
suspect's] will to resist and bring about confessions not freely
self-determined." Id. at 347-48. Here, of course, Mr. Dilworth
was interviewed by a single unarmed revenue agent in the presence
of his accountant in the accountant's office. (Dilworth Aff.
Feb. 13, 2012 at ¶ 8.)

for such a proposition emanates from a handful of cases in other courts on which the defendant heavily relies.  These cases are not binding authority on this court, but as they are the only cases which specifically address the instant issue, the court will examine these cases in detail, which approach the issue as the Defendant does here, as arising under Fourth Amendment seizure law.

In 1977, the Fifth Circuit wrote: "A consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue Agent." <u>United States v. Tweel</u>, 550 F.2d 297, 299 (5th Cir. 1977).  For the elements of deceit, trickery or misrepresentation to be present, "the defendant must establish that the agents affirmatively misled [the taxpayer] as to the true nature of their investigation and that this affirmative misleading was a material factor in [the taxpayer's] decision to give information to the agents." <u>United States v. Peters</u>, 153 F.3d 445, 456 (7th Cir. 1998).

Under IRS regulations, "a revenue agent who uncovers a 'firm indication of fraud on the part of the taxpayer' must immediately suspend her audit and refer the case to the CID." <u>Peters</u>, 153 F.3d at 447.  According to the Seventh Circuit, "[I]f a revenue agent continues to conduct a civil audit after developing 'firm indications of fraud,' a court may justifiably conclude that the

agent was in fact conducting a criminal investigation under the auspices of a civil audit." Id. at 452. This is commonly referred to as the "firm indication of fraud" rule. The firm indication of fraud rule "serves a useful function in guiding the district court's inquiry on the ultimate question as to whether there has been a deliberate misleading by the government" and whether the IRS agents affirmatively misled a defendant as to the true nature of their investigation. Id. at 456.

The Seventh Circuit observed that a revenue agent must "suspend her activities at the earliest opportunity after developing firm indications of fraud." Id. at 455 (citing Internal Revenue Manual § 4350 HB 22(34)). The continuation of audit activities after a revenue agent initiates the fraud referral process may be indicative of an agency attempt to gather information for a criminal prosecution under the guise of a civil audit. Id. "It is clear that the IRS may not develop a criminal investigation under the auspices of a civil audit. . . . Therefore, once an IRS agent has developed 'firm indications fraud' in a civil investigation, the case must be turned over to the CID." United States v. Grunewald, 987 F.2d 531, 534 (8th Cir. 1993).

The defendant relies primarily on two cases in support of his argument that suppression is warranted, United States v. Tweel, 550 F.2d 297 (5th Cir. 1977) and United States v.

<u>Touissant</u>, 456 F. Supp. 1069 (S.D. Texas 1978).[6]

In <u>Tweel</u>, a revenue agent conducted an audit on the defendant at the request of the Organized Crime and Racketeering Section of the Justice Department. <u>Tweel</u>, 550 F.2d at 298. These facts are completely distinct from the factual issue in this case. First, unlike the case at bar, the audit in <u>Tweel</u> did not start out as a civil audit. It began as a request explicitly in furtherance of a criminal investigation. In addition, the defendant in <u>Tweel</u> specifically asked the revenue agent if a special agent was involved in the investigation, presumably to determine if the audit was criminal in nature. <u>Id.</u> at 298. The revenue agent replied in the negative but did not disclose the criminal nature of the audit. <u>Id.</u> The court found this silence deceptive.

Unlike <u>Tweel</u>, here the defendant was never given a deceptive response by Agent Phillips and the defendant never inquired as to the civil or criminal nature of the interview. There is no evidence in the record that Agent Phillips misled the defendant or misrepresented the nature or purpose of the November 30, 2006 interview. Agent Phillips honestly disclosed to the defendant that he was seeking information regarding the nature and purpose of MCI. Questions regarding two six figure transactions which

---

[6] A thorough search by the court and the parties revealed no Supreme Court or Third Circuit precedent on the instant issue.

involved shareholders of MCI were clearly within the purview of the investigation. Mr. Dilworth clearly understood that IRS Agent Phillips was conducting a serious months-long investigation of MCI and the surrounding transactions, and that he was not free to lie to the IRS agent.

In Toussaint, a revenue agent conducted an audit on the defendant, who was himself employed as an IRS revenue agent, after the defendant reported the loss of a $190,000 Picasso painting. Toussaint, 456 F. Supp. 1069, 1070. During the initial interview, the defendant told the revenue agent he had received the Picasso as a gift from his grandfather, who was not a wealthy man, no gift tax return was filed or paid, the defendant did not know where his grandfather obtained the painting and the defendant had never had the painting appraised. Id. at 1071. After this initial interview, the revenue agent continued to work on the case for six months before referring it to the CID. Id.

The court concluded the revenue agent should have referred the case to CID immediately after the initial interview. Id. The court determined that after the interview, "the Revenue Agent had, without any question, discovered firm (in fact almost conclusive) indications of fraud." Id. The court went further to state that "no sensible person would believe that there was any real likelihood, in view of the admissions made by Toussaint

22

concerning the financial status of the grandfather, and
concerning his own failure to have this supposedly valuable
painting appraised and insured, that Toussaint actually owned a
$190,000 Picasso." Id. at 1072. The court further stated that
the defendant was employed as a revenue agent, and as a
sophisticated and experienced party, "would have known that he
was allowed to deduct only an amount equivalent to his
grandfather's basis in this painting." Id. Consequently, the
court concluded that as of the initial interview, the revenue
agent had firm indications of fraud and was required to refer the
case to CID. Id. at 1074. However, the revenue agent continued
the investigation for six months which was improper. Id.
Therefore, the court held suppression was the appropriate remedy
and excluded all statements and interviews by the defendant after
the initial interview. Id. at 1075.

    The Toussaint case is also distinguishable from the case at
bar. In Toussaint, firm indications of fraud were apparent from
the first meeting with the taxpayer because the taxpayer was a
sophisticated party and the story he told about the Picasso
painting lacked any credibility. Here, until November 30, 2006,
the Revenue Agent was unable to meet with the defendant to
determine whether a credible explanation existed for the
discrepancies in his tax returns. It is clear that Toussaint
further emphasizes the point made by Fraud Technical Advisor

Gerwald - that a criminal referral is not appropriate until an explanation is given by the taxpayer and the IRS can then determine whether the explanation is credible.  Therefore, the Toussaint case is not persuasive in finding suppression warranted in the instant action.

The court finds that the revenue agent's November 30, 2006 meeting with Dilworth was in the context of a civil investigation, not under the direction of the criminal investigative arm of the IRS.  It is clear from the testimony of Phillips and Gerwald that the IRS followed their procedure for criminal referral.  Phillips himself was left confused by Fabietti's explanations of the L. Jay and MCI entities and the transactions at issue, as he credibly testified.  Fabietti had dodged interviews for several months and gave incomplete or evasive explanations.  Phillips sensed there might be fraud but reasonably needed to hear Dilworth's own explanation.  There is no evidence that CID was pulling the strings of the civil investigation or that CID was even involved until after the case was officially referred in January, 2007.  Agent Phillips' contact with Special Agent Gavin was reasonable considering Gavin's subject matter expertise in the South Jersey construction field.  Gavin's brief and non-productive involvement in the case is not indicative of a criminal investigation being conducted under the guise of a civil audit.  Further, Fraud Technical

Advisor Gerwald was quite properly involved in the investigation and monitored the referral process to ensure the civil audit was not used as an instrument of criminal prosecution.  FTA Gerwald's practice in this case followed his reasonable belief that a personal interview with the taxpayer should be obtained to assess the taxpayer's explanations and state of mind before determining whether the indications of fraud rise to the level warranting a criminal referral.  This appears to be a reasonable assessment of a dividing line between fraud of a civil nature and the more exacting standard for criminal fraud requiring willfulness to be proved beyond a reasonable doubt if the case is tried.  It was reasonable, and not deceptive, for FTA Gerwald to direct Revenue Agent Phillips that a personal interview of taxpayer Dilworth was necessary before indications of fraud sufficient to warrant a criminal referral might exist.  This was also Phillips' first case to develop indications of fraud, and his deference to the more cautious approach of FTA Gerwald, a veteran of 25 years as an IRS agent advising on 100-200 potential fraud cases in New Jersey at any given time, was reasonable and in accordance with IRS procedures.

Phillips' handling of the defendant's designated power of attorney, Victor Fabietti, should have included more conclusive verification of Fabietti's CPA credentials, and he should have informed his supervisor of the problem, as discussed above.

However, while Fabietti did lie to the IRS regarding his CPA
credentials, this fact is not critical to the firm indicators of
fraud analysis, which reasonably required a thorough review of
tax returns and an interview with the taxpayer prior to referral
in any event.  Indeed, the interview with the defendant ensured
that the civil audit group would not make a hasty referral to CID
based on Fabietti's representations alone.  It is undisputed that
the IRS did not have an explanation from the defendant taxpayer
as to the questionable transactions until November 30, 2006, and
without this explanation, the IRS could not reliably assess
whether criminal referral was appropriate, as FTA Gerwald
credibly testified.  The IRS did not select Fabietti as a
representative, but Dilworth did.

In addition, there is no evidence that the IRS affirmatively
misled Dilworth.  He well knew on November 30 that the IRS was
auditing MCI and its shareholders about some questionable
transactions, and he knew he was not free to give false answers
to the agent's questions.  In point of fact, even after the
referral of this investigation to the Criminal Division in
January, 2007, the defendant reiterated that the transactions at
issue were loans when he was interviewed by the Criminal Division
later in March, 2007.  The Government proffers that the defendant
chose to lie to Agent Phillips in November 2006 and reiterated
the same lie when he was interviewed in the course of a criminal

investigation four months later. A reasonable taxpayer knows that lying to a federal agent would have consequences whether in a civil audit or in a criminal investigation. To extend the current precedent, such as it is, to this situation, in which the fraudulent nature of the reported transactions was not manifest until after the defendant was interviewed, would give a windfall to the defendant which is not warranted. A thorough rehearing of this issue demonstrates that defendant's statements in November 2006 and March 2007 were not procured by IRS deceit or trickery, that the IRS did nothing to overbear defendant's freewill, that the purposes of the audit were civil and were not directed by any criminal investigative element in the IRS, and that the IRS reasonably determined that a determination of the existence of firm indications of fraud could not be made before the revenue agent obtained Dilworth's explanation about the transactions under audit.

Therefore, the Defendant's motion to suppress will be denied.

## IV.  CONCLUSION

For the reasons discussed above, the court has reconsidered its December 12, 2011 decision and will again deny the Defendant's motion to suppress.

The accompanying Order will be entered.

| | |
|---|---|
| **April 20, 2012** | **s/ Jerome B. Simandle** |
| Date | JEROME B. SIMANDLE |
| | Chief U.S. District Judge |